## DOUGLASS v. NORTHERN CENT. RY. CO.

(Supreme Court, Appellate Division, Third Department.  May 3, 1899.)

RAILROADS—INJURY TO EMPLOYE—EVIDENCE—SUFFICIENCY.

Two intersecting railroads were connected by a Y, from which, at a short distance from the points of connection with the main tracks, another Y branched off.  While a train on one road was switching a car onto the Y, on a very dark night, a brakeman hanging onto the side was struck by another car, standing on the Y, too near the main track, and attached to other cars, which had been placed there a few hours before by employés of the same road.  Plaintiff claimed the cars were placed far enough from the main track, but had been shoved back by a train on the other road.  The employés testified that they placed the cars so that the end one was a certain distance from the connection of the Y with the main track, but their estimates of the margin were small.  They also testified,—some positively, and some from recollection,—that the cars were placed on the first Y.  A passer-by on the highway testified that some cars were on the first Y, and while he was there a train on the other road backed down till it met such cars, but he could not state whether any were taken out or pushed back.  Several of the crew of the train on which the brakeman was injured, who, however, had made no particular examination, testified that the cars were on the first Y.  An inspector employed by both roads, and called by the injured brakeman, testified that the next morning he saw that the cars furthest from the main track were on the second Y.  The crew of a train on the other road, which backed down on the first Y several hours before the accident, testified that they took out all the cars on that Y, and that there were others on the second Y.  There was no evidence as to what occurred between such time and the accident, or that the cars were moved after the accident, and before the next morning.  *Held* not to show that the injury was caused by cars being pushed back by the train of the second road, so as to render it liable.

Appeal from trial term, Oswego county.

Action by Cora M. Douglass, as administratrix of the estate of Virgil D. Douglass, deceased, against the Northern Central Railway Company.  From a judgment entered on a verdict for plaintiff, and from an order denying a new trial, defendant appeals.  Reversed.

Argued before PARKER, P. J., and LANDON, HERRICK, PUTNAM, and MERWIN, JJ.

George M. Diven, for appellant.

D. P. Morehouse, for respondent.

MERWIN, J.  On the night of the 18th of December, 1895, about 11:40, a freight train upon which the plaintiff's intestate, Virgil D. Douglass, was a brakeman, left Oswego for the west on the Rome, Watertown & Ogdensburg Division of the New York Central Railroad.  The train arrived at Wallington about 1:25 on the morning of the 19th.  At that place the track of the Rome, Watertown & Ogdensburg Railroad crosses the track of the defendant nearly at right angles.  For the purpose of transferring freight cars from one road to the other, there had been constructed across the southeasterly angle three Y's.  One of them, called the "Old Y," or "Y No. 1," started from a point in a siding or passing track of the Rome, Watertown & Ogdensburg road, about 800 feet easterly from the intersection of the two roads, and then passed on a curve that gradually diverged

westerly and southerly to the defendant's track. This Y was about 1,200 feet long, and is the only one connected directly with the passing track. Y No. 2 starts from the northerly side of Y No. 1, at a point about 80 feet distant from the connection of No. 1 with the passing track, and thence proceeds, not far from No. 1, until it again connects with it near the defendant's track. Y No. 3 starts in like manner from No. 2, further on, and returns to it before the junction of Nos. 1 and 2. Upon the arrival at Wallington of the train on which was plaintiff's intestate, the train proceeded to the crossing, and then backed easterly upon the passing track towards the point of connection of that track with Y No. 1, for the purpose of placing upon that Y, for delivery to the defendant, a box car. The night was very dark, and, as the box car was being pushed along, Douglass was standing on the stirrup on the south side of the car, just at the east or forward end, and was holding on to the grab irons with both hands, and had a lantern on his left arm. On the Y, where it gradually diverged from the passing track, there was a gondola car. This was far enough from the passing track to admit of the passage of the box car, but not far enough to allow the passage of the man on the side; so Douglass was hit as the box car passed by the gondola, and received an injury that caused his death. That gondola car, with three other empty freight cars, had been left in that locality previously the same night by the crew of a freight train that left Oswego at 7:15 in the evening, reaching Wallington about 10 o'clock. The claim of the plaintiff is that these four cars, when left there, were pushed far enough onto the Y to leave room for the safe passage of the deceased on the box car, and that afterwards, and before the train of the deceased came in, a freight train of the defendant, coming from the north, had operated and moved cars on the Y, and had pushed eastwardly the gondola to its unsafe position. It was therefore incumbent on the plaintiff to show, not only that the gondola was originally placed in a safe position, so that it would not have hit the deceased, but also that it was moved by the defendant's employés from that position to the place where it was at the time of the collision.

Four of the crew of the first train—the conductor, engineer, fireman, and one of the brakemen—were called as witnesses for the plaintiff, and described the manner in which they put in the four cars. The conductor, Mr. Hare, testified that in his judgment the east end of the block of four cars was 60 feet from the frog where the Y joins the passing track; that he did not recollect what Y they were on, but thought they were on Y No. 1, but not positive. He afterwards testified that, according to his recollection, they were left on Y No. 1. He said the night was very dark, and that he did not personally make an examination of the Y, to see its condition, before putting the cars on, and did not go back to see what condition it was in after putting them there. The engineer testified that he shoved the four cars onto Y No. 1 about the same distance as the conductor testifies, and that in doing so he pushed forward other cars that were already on the Y. He did not get off from his engine. The fireman gives about the same estimate of distance, and says that the east

car was in to clear seven or eight feet, and that he was not positive which Y the cars were put on, but thought it was Y No. 1; and he afterwards said he was positive that they were pushed onto that Y. He did not leave his engine. Mr. McCarthy, one of the brakemen, testified that the four cars were coupled together, and were shoved onto Y No. 1; that he went ahead, and coupled them on to others that were on that Y, and that he went along the Y to a highway crossing, and that the block of cars, when the engineer got through pushing them, was 15 or 20 feet from the crossing. He says he cannot tell how far the cars were pushed in from the passing track, but that the cars must have been in from the· passing track 10 or 12 feet in a straight line across. A Mr. Shafer testified on the part of plaintiff that he was at the highway crossing that evening, a little after 10 o'clock; that there were four or five or six cars on Y No. 1 east of that crossing, and came up to about 10 feet of the crossing; that soon after that he saw an engine of defendant back in on that Y, and push some cars back till they met. the cars on the east side of the highway; but whether any cars were taken out he cannot say. He was 150 to 200 feet from the crossing, and he is hardly able to say that any of the cars that were already east of the crossing were pushed back. Several of the crew of the train that the intestate was on testify that the four cars were on Y No. 1 when, after the accident, they placed on the Y the box car on which the intestate had been riding. They, however, agree that the night was very dark, and it is apparent that no particular examination was made to ascertain on which Y the cars were. Mr. La Rock, an inspector in the employ of both roads, and called by the plaintiff, testified upon his cross-examination that about 8 o'clock the next morning he saw the four cars in question, together with the box car above referred to, and some others that were there before, and that the west end of this batch of cars was on Y No. 2, but the east end was on Y No. 1, the track of which leads to Y No. 2. There was no evidence that the cars had been moved after the box car was put in.

On the part of the defendant it appeared that about 11 o'clock of the night in question some cars were taken from Y No. 1 by one of its freight trains. The conductor, engineer, and two brakemen were called as witnesses, and, in substance, testified that they backed onto the Y from its southern terminus, coupled on to three cars that were on the southwesterly side of the highway, then pushed along the Y eastwardly until five loaded cars were reached that were easterly of the highway, then coupled onto them, and drew them out; that, in coupling, the cars were not pushed back eastwardly; that the five cars were the only ones they saw on that Y east of the highway; that there were other cars on Y No. 2. It appears that the grade is ascending from the southwestern end of the Y eastwardly.

There was no direct evidence that the cars were pushed back by the defendant's train, but it is argued that, if the cars were placed on Y No. 1 in the position described by plaintiff's witnesses, they must have been pushed back by somebody, and that there was no one there that could do it except the employés of .defendant. There seems, however, to have been a period of from one to two hours after

the train of defendant left before the arrival of the train on which was plaintiff's intestate. What, if anything, occurred during that period, does not appear. The theory of the plaintiff as to the original position of the cars depends largely, if not entirely, on the correctness of the estimates of distance, in a very dark night, with the aid of an occasional lantern. The difference of a few feet might change the result. If the gondola was in on the Y, 60 feet from the frog, as testified to by witnesses for plaintiff, the margin of safety was a small one, having in view the distance which cars project over the track. It was necessary for the plaintiff to establish as a fact that the cars in question were put in on Y No. 1. If they were not, then defendant's employés were not responsible, as the cars which they pushed back, if any, were on Y No. 1. If the evidence of Mr. La Rock is correct, then the four cars, though necessarily entering on Y No. 1, were carried onto Y No. 2, and never were in a position to be pushed back by defendant's train. Mr. La Rock must be presumed to be a reliable witness, being called by the plaintiff, and, as his examination of the locality was made in the daytime, he was less liable to be mistaken than the others who were only there in the night. The evidence of La Rock supports the evidence of defendant's employés in this respect. "If, upon the testimony, it is as probable that the injury resulted from the act of another as from that of the defendant, the plaintiff cannot recover." Ruppert v. Railroad Co., 154 N. Y. 90, 47 N. E. 971. The verdict rests on the conclusion that the injury was caused by the pushing back of the gondola car by the defendant's train. This conclusion is not, we think, sustained by the weight of the evidence.

Judgment and order reversed on the facts, and new trial granted; costs to abide the event. All concur.